## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLOBUS MEDICAL INC. | : | |
| 2560 General Armistead Ave. | : | |
| Audubon, PA 19403 | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. _____ |
| | : | |
| EDWARD SHARP | : | JURY TRIAL DEMANDED |
| 23030 Whisper Canyon | : | |
| San Antonio, TX 78258, | : | |
| | : | |
| ANDREW MILLER | : | |
| 20303 Messina | : | |
| San Antonio, TX 78258, | : | |
| | : | |
| BROOKE STEPHENS | : | |
| 3231 North Loop 1604 West #4206 | : | |
| San Antonio, TX 78257, | : | |
| | : | |
| HUNTER BAILEY | : | |
| 19326 Boca Del Mar | : | |
| San Antonio, TX 78258, | : | |
| | : | |
| MEDTRONIC INC. | : | |
| 710 Medtronic Parkway | : | |
| Minneapolis, MN 55432, | : | |
| | : | |
| and | : | |
| | : | |
| MEDTRONIC USA INC. | : | |
| 710 Medtronic Parkway | : | |
| Minneapolis, MN 55432 | : | |
| | : | |
| Defendants. | : | |

## <u>COMPLAINT</u>

AND NOW Plaintiff Globus Medical Inc. ("Globus"), by and through its attorneys, hereby

files this action against Edward Sharp ("Sharp"), Andrew Miller ("Miller"), Brooke Stephens

("Stephens"), Hunter Bailey ("Bailey") (together, the "Individual Defendants") and Medtronic Inc.

and Medtronic USA Inc. (collectively referred to herein as "Medtronic").

## INTRODUCTION

Medtronic wanted to grow its business in the San Antonio, Texas market.  Instead of doing

it the right way by fairly competing for employees and customers in the marketplace, Medtronic

devised a scheme to lift out Globus's San Antonio sales team for the purpose of converting the

Globus customers to Medtronic and harming Globus.  In this way, not only would Medtronic's

market position improve, but Globus's would worsen—to Medtronic's benefit. Medtronic's

scheme found willing participants in the Individual Defendants, in particular Defendant Sharp.

Medtronic induced Sharp with huge financial incentives to solicit his San Antonio sales team and

convert his Globus customers, all in derogation of restrictive covenants that prohibit precisely this

conduct.  With the support and assistance of Medtronic and its employee, Defendant Miller (who

joined Medtronic from the Globus San Antonio territory less than one year ago), Sharp and the

other Individual Defendants are presently carrying out a long-planned conspiracy to illegally steal

Globus's business for themselves.  To make matters worse, this scheme was devised and carried

out while Defendants Sharp, Stephens and Bailey were still actively working for Globus, using

Globus's  financial  resources,  confidential  information,  employment  relationships,  business

relationships and goodwill, to steal Globus's hard-earned customers and employees for and at the

behest of Medtronic.  Moreover, while engaging in this scheme, Defendant Sharp engaged in other

schemes during his employment with Globus to redirect business to other competitors so that Sharp

could further profit at the expense of Globus, all in blatant violation of his duty of loyalty to

Globus.  Finally, Defendant Sharp has further breached his contractual obligations to Globus by

refusing to pay back to Globus funds that he owes the company following his separation of employment.

## PARTIES

1.     Plaintiff Globus is a Delaware corporation with its principal place of business at 2560 General Armistead Ave., Audubon, Pennsylvania 19403.  Globus is in the business of designing, developing and commercializing medical devices that enable surgeons to promote healing in patients with musculoskeletal disorders. Globus markets and sells its medical devices to doctors and hospitals worldwide, with a significant amount of its revenue coming from sales in the United States.

2.     Defendant Edward Sharp is a former Spine Territory Manager of Globus who resides in San Antonio, Texas.

3.     Defendant Andrew Miller is a former Spine Territory Manager of Globus and current employee of Defendant Medtronic who also resides in San Antonio, Texas.

4.     Defendant Brooke Stephens is a former Associate Spine Specialist of Globus and current employee of Defendant Medtronic who also resides in San Antonio, Texas.

5.     Defendant Hunter Bailey is a former Spine Territory Manager of Globus and current employee of Defendant Medtronic who also resides in San Antonio, Texas.

6.     Defendant Medtronic, Inc. is a Minnesota corporation with its principal place of business at 710 Medtronic Parkway, Minneapolis, MN 55432.

7.     Defendant Medtronic USA Inc. is a wholly-owned subsidiary of Medtronic Inc., and is a Minnesota Corporation with its principal place of business at 710 Medtronic Parkway, Minneapolis, MN 55432.  Defendants Medtronic, Inc. and Medtronic USA Inc. are collectively referred to herein as "Medtronic" or "Defendant Medtronic."

8.      Medtronic is in the business of manufacturing and selling a variety of medical device products, including spinal and musculoskeletal therapies.  Medtronic markets and sells its medical devices worldwide, as well as to doctors and hospitals across the United States. Medtronic is a direct competitor of Globus, Medtronic's spinal and musculoskeletal therapies compete directly with Globus's spinal and musculoskeletal therapies, and Globus and Medtronic often compete in the same U.S. markets for the same customers and employees.

## JURISDICTION AND VENUE

9.      Globus and each Individual Defendant are parties to a No Competition and Non-Disclosure Agreement ("NCNDA").   True and correct copies of the Individual Defendants' NCNDAs are attached hereto as Exhibits A, B, C and D (the "Miller NCNDA," the "Sharp NCNDA," the "Stephens NCNDA" and the "Bailey NCNDA").

10.      Paragraph 6.5 of each Individual Defendant's NCNDA states: "I agree and consent that this NCND Agreement shall be enforced as a contract of the Commonwealth of Pennsylvania because Globus's operational and worldwide headquarters are located in Pennsylvania.  I agree that the validity, enforceability, construction and interpretation of this NCND Agreement shall be governed by the laws of the Commonwealth of Pennsylvania, without regard to its conflict of law rules.  I also agree and consent that any and all litigation between Globus and me relating to this NCND Agreement will take place exclusively in the Commonwealth of Pennsylvania, and I consent to the jurisdiction and venue of the federal and/or state courts in the Commonwealth of Pennsylvania." See Miller NCNDA at ¶ 6.5, Sharp NCNDA at ¶ 6.5, Stephens NCNDA at ¶ 6.5, Bailey NCNDA at ¶ 6.5.

11.      This Court has personal jurisdiction over the Individual Defendants in this action because: (1) they have caused damage within the State of Pennsylvania and (2) they all consented

to the jurisdiction of the federal courts in the state of Pennsylvania for any disputes arising out of their No Competition and Non-Disclosure Agreements ("NCNDAs").

12.     This Court has personal jurisdiction over Defendant Medtronic because, among other reasons, it has caused damage within the State of Pennsylvania, it is registered to do business in this state, it regularly transacts business in this state, it employs sales employees in this state, and it was reasonably foreseeable that Medtronic would be bound by the NCNDA's forum selection clause when it induced the Individual Defendants to breach those agreements.

13.     The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332 because the suit is between citizens of different states and the amount in controversy exceeds $75,000.  In particular, the financial harm to Globus if the Individual Defendants are allowed to violate their NCNDA's with impunity well exceeds $75,000.

14.      Pursuant to 28 U.S.C. § 1391, venue is appropriate because a substantial part of the damages giving rise to this dispute occurred within this district. Additionally, the Individual Defendants have agreed that this Court is the appropriate venue for disputes arising out of their NCNDAs.

**FACTS**

**Globus's Business Model and Development of Customer and Co-Worker Relationships**

15.     Globus is a medical device company that specializes in products that assist surgeons in treating musculoskeletal disorders.  In particular, Globus specializes in spinal surgery products, including a surgical robot and a wide array of orthopedic spine implants.

16.     Globus sells its products through field sales representatives.  In general, a field sales representative's duties include providing support for hospitals and surgeons, being present in the operating room during surgery as technical support for Globus products for hospital personnel,

5

providing service to get the products to the hospital and ensuring that the products and instrumentation needed for the surgery and are prepped and ready to use in surgery.

17.     To manage sales, Globus splits the country into regions, each of which is managed by a Vice President of Sales.  Globus splits these regions into areas, each managed by an Area Director.  That area may be further split into territories supported by a Spine Territory Manager. Depending on the level of business in that territory, the territory manager may be the sole sales representative in the territory, or they may have sales representatives underneath them to assist with supporting sales in that territory.  Territories may be geographical areas and/or specified customers that may not be geographically contiguous.  Sales representatives receive compensation based on the Globus sales that take place in the territory.

18.     The spinal surgery product market is highly competitive, with multiple companies, including Globus and Medtronic, competing to sell their products to the limited number of customers who purchase or use those products.

19.     In addition to being highly competitive, the spinal surgery product market is defined by trust between the product supplier and customers.  Customers rely on Globus sales representatives to ensure that the proper devices and instrumentation are prepared and ready to use prior to a surgery and may request technical support from the sales representative during surgery. Accordingly, customers generally will only commit to purchasing a product from a supplier with whom they are familiar and have developed trust.

20.     To establish trust with its customers, Globus relies on its sales representatives, whose primary job duty is to build and maintain relationships with current and prospective Globus customers, including hospitals, surgeons, and their staff.   As a result, Globus's sales

representatives, including territory managers, routinely interact with Globus customers and prospective customers.

21.     Globus invests heavily in its sales representatives, providing substantial training regarding sales strategies and relationship building techniques.  As explained above, Globus also assigns sales representatives to specific territories so that those sales representatives can build and maintain strong relationships within those territories.

22.     In addition to establishing relationships with current and prospective customers, Globus encourages sales representatives to develop strong working relationships with their teammates in their assigned sales territory.  Globus encourages teambuilding through training, team building activities and other programs to encourage the sales representatives in a specific territory to work together.

23.     Through their employment with Globus, sales representatives are also given access to Globus's confidential information regarding customer preferences, customer pricing, products, marketing and sales pipelines, and other information not generally known to the public related to Globus's business.

24.     To protect Globus's substantial investment in its sales force and the customer and co-worker relationships that Globus encourages its sales employees to build and maintain, and to protect against the improper use or disclosure of its confidential information, Globus requires all members of its sales force to sign a NCNDA at the time of hiring and as a condition of employment. Among other things, the NCNDA prohibits sales employees from soliciting fellow co-workers, and from working for a competing company in a competitive position and soliciting, supporting or servicing Globus customers within a specific territory for a limited period of time after their employment with Globus ends.  The NCNDA also prohibits the improper use or disclosure of

Globus confidential information. The NCNDA is designed to ensure that Globus's sales employees cannot leverage Globus's customer goodwill, confidential information and the customer and co-worker relationships that its sales employees have access to and develop while employed by Globus to compete unfairly and use for their own benefit and the benefit of a future employer.

## Defendant Miller's Employment with Globus

25.    Globus hired Miller in July 2019 as a Spinal Territory Manager to work in a territory in and around San Antonio, Texas.  Miller's duties for Globus included, among other things, managing and further developing existing Globus customer relationships in the San Antonio Territory, developing relationships with prospective Globus customers, selling Globus products and facilitating their delivery.  Throughout his tenure with Globus, Miller gained access to confidential information and cultivated personal relationships with customers and his fellow Globus sales team members generally within the San Antonio territory, which corresponds roughly to the following geographic area in Texas: Waco south to Corpus Christi encompassing Austin and San Antonio, then west to San Angelo (hereinafter "San Antonio Territory").

26.    In January 2020, Miller left Globus briefly, before returning.  Miller returned to employment with Globus in February 2020.  Globus required Miller to sign a NCNDA as a condition of his employment when he was first hired in 2019, attached here as Exhibit E, and upon his return in February 2020, the Miller NCNDA.  *See* Exhibit A.  Among other terms, Miller agreed to the following provisions in the NCNDA:

a.  During the No Competition Period[1], he would not "directly or indirectly engage in any Competitive Activity[2] with any Hospitals or Medical Personnel.[3] *Id.* at ¶ 3.1.

b.  "During the No Competition Period, I agree not to directly or indirectly, either for my benefit or the benefit of another individual or entity, solicit, call on, interfere with, attempt to divert, entice away, service, support, sell to or market to any Hospital in the NCND Territory, or to any Medical Personnel in the NCND Territory who performs any services related to a Competing Product or Service (regardless of whether such services are also provided by the Medical Personnel outside the NCND Territory)." *Id.* at ¶ 3.2.

c.  "During the No Competition Period, I agree not to directly or indirectly, either for my benefit or the benefit of another individual or entity, employ or offer to employ in any capacity, solicit, call on, attempt to divert, entice away or recommend for employment or contractual relationship with a Competing Company, any individuals who are or were employees, independent contractors, representatives or

---

[1] The No Competition Period is defined as "the time period encompassing both the [employment relationship] and the 12-month period immediately after termination of the [employment relationship]."  Exhibit A, at ¶ 2.10.

[2] "Competitive Activity" is defined as "direct or indirect participation in, performance of, services for, employment by, ownership of any interest in, or assistance, promotion or organization of, any Competing Company."  Exhibit A, at ¶ 2.4.

[3] "Hospitals" is defined as "hospitals, surgery centers, medical centers and other health care facilities that purchase Globus products or services and the location at which Medical Personnel perform services related to the purchase, implantation or other handling and usage of the Globus products or services."  Exhibit A, at ¶ 2.7.  "Medical Personnel" is defined as "orthopedic surgeons, neurosurgeons, physicians, nurses and other medical personnel involved in the implantation, purchase or other handling and usage of Globus products or services, including but not limited to employees, agents or persons who control, direct, manage or influence purchasing decisions of any hospitals."  *Id.* at ¶ 2.8.

employees of [Globus] or any of [Globus]'s distributors at any time within the preceding 12 months."  *Id.* at ¶ 3.3.

27.     Miller worked for Globus until April 2021.  During that time period, Miller, as part of his job responsibilities for which he was significantly compensated, gained access to confidential information, and developed close relationships with Globus customers and the members of the San Antonio Territory team.

**Defendant Sharp's Employment with Globus**

28.     On January 10, 2020, Globus hired Sharp.  Shortly after being hired by Globus, Sharp briefly left Globus to return to work for his former employer, NuRepublic, a distributor of Nuvasive, Inc.  Sharp only briefly worked for NuRepublic before returning to Globus on February 14, 2020.

29.     Globus employed Sharp as a Spine Territory Manager for the San Antonio Territory.

30.      Sharp's duties for Globus included, among other things, managing and further developing existing Globus customer relationships in the San Antonio Territory, developing relationships with prospective Globus customers, selling Globus products and facilitating their delivery, and managing junior sales representatives on the team.  In this capacity, Sharp, as a consequence of his job duties and for which he was substantiality compensated, gained access to confidential information, and developed relationships with Globus's current and prospective customers and the Globus sales team.

31.     Globus required Sharp to sign a NCNDA as a condition of his employment when he was first hired on January 10, 2020, attached here as Exhibit F, and another NCNDA shortly after he was re-hired on February 14, 2020, the Sharp NCNDA.  *See* Exhibit B.  The Sharp

NCNDA is substantively identical to the Miller NCNDA, and Sharp agreed to the same terms, including the non-competition and non-solicitation provisions. *See Id.* at ¶¶ 3.1 – 3.3.

32.     On February 14, 2020, after Globus re-hired Sharp, Globus and Sharp entered into a Minimum Monthly Guarantee Draw Agreement (MMGDA).  The MMGDA provided for, among other things, a minimum amount of monthly compensation as a draw (or advance) on future commissions in the event that commissions do not meet a specific compensation threshold.  This monthly compensation is often referred to in the industry as a "guarantee."

33.     In the February 2020 MMGDA, Globus promised Sharp $66,667.00 monthly minimum compensation.  Sharp's MMGDA is attached hereto as Exhibit G (the "Sharp MMGDA").  The draw was conditioned on Sharp's continued employment with Globus for a period of 24 months, and expressly states that the guaranteed draw is not deemed earned unless this condition was met.  The MMGDA further states that if the 24-month employment condition is not met, Sharp would be required to repay any and all draw payments in excess of $10,000 per month at the time of his separation of employment.

34.     On February 26, 2021, Sharp and Globus entered into a second MMGDA ("February 2021 MMGDA").  In the February 2021 MMGDA, Globus promised Sharp $66,667.00 monthly minimum compensation.  Sharp's February 2021 MMGDA is attached hereto as Exhibit H.  The draw was conditioned on Sharp's continued employment with Globus for a period of 18 months, and expressly states that the draw is not deemed earned unless this condition was met.  The MMGDA further states that if the 18-month employment condition is not met, Sharp would be required to repay any and all draw payments in excess of $10,000 per month at the time of his separation of employment.

35.     On October 15, 2021, Globus and Sharp entered into a Field Sales Interim Advance Agreement (the "FSIAA") in which Globus agreed to extend Sharp's minimum draw of $66,667.00 through August 2022, attached hereto as Exhibit I.  The FSIAA provided that the draw was conditioned on Sharp's continued employment with Globus for a minimum of 18 months from the date of the agreement and stated that the "payments are advances and are not earned until this condition is met."  Finally, the FSIAA provided that if Sharp resigns or is terminated prior to the end of the 18-month period, Sharp would be required to repay any and all draw payments in excess of $10,000 per month at the time of his separation of employment.

**Defendants Bailey's and Stephens's Employment with Globus**

36.     Globus hired Bailey on February 24, 2020 as a Spine Territory Manager and Globus hired Stephens on January 28, 1019 as an Associate Spine Specialist in the San Antonio Territory.

37.     As a Spine Territory Manager, Bailey had similar job duties and responsibilities as Miller and Sharp.

38.     As an Associate Spine Specialist, Stephens's duties for Globus included assisting Spine Territory Managers in developing relationships with prospective Globus customers and selling Globus products and facilitating their delivery. Stephens assisted Defendants Sharp, Miller and Bailey in their duties as Territory Managers.

39.     In this capacity, Stephens, as a consequence of her job duties and for which she was substantiality compensated, gained access to confidential information, and developed relationships with Globus's current and prospective customers and her Globus sales team.

40.     Globus required Stephens to sign a NCNDA as a condition of her employment.  *See* Exhibit C. The Stephens NCNDA is substantively identical to the Miller NCNDA and Sharp

NCNDA, and Stephens agreed to the same terms, including the non-competition and non-solicitation provisions.  *See* Stephens NCNDA ¶¶ 3.1 – 3.3.

41.     Globus also required Bailey to sign a NCNDA as a condition of his employment. *See* Exhibit D.  The Bailey NCNDA is substantively identical to the Miller NCNDA, the Sharp NCNDA, and the Stephens NCNDA and Bailey agreed to the same terms, including the non-competition and non-solicitation provisions.  *See* Bailey NCNDA ¶¶ 3.1 – 3.3.

42.     The Individual Defendants worked closely together at Globus in the San Antonio Territory.  Together, and with the support of their team, they developed close relationships with Globus's customers.

### Defendants Conspire to Unlawfully Lift Out Globus's San Antonio Team and Convert Globus's Customers

43.     In April 2021, Globus terminated Miller's employment.

44.     Approximately six weeks after Globus terminated Miller's employment, Medtronic hired Miller as a sales representative in the San Antonio area.

45.     Prior to hiring Miller, Medtronic did not have a strong presence in the San Antonio area.  Upon information and belief, Medtronic hired Miller for the sole purpose of inducing Miller to leverage his relationships with his Globus San Antonio colleagues to lift out Globus's San Antonio team and convert the Globus customers that team serviced.  In short, instead of fairly building a team to compete in the San Antonio market, Medtronic decided it would be easier to steal a Globus team, and induce them to violate their NCNDAs by using Globus's confidential information and trading on the goodwill Globus had developed in the San Antonio Territory for its own benefit, and to the detriment of Globus.

46.     To execute their scheme, Miller knew he needed Sharp, who still worked for Globus and had critical relationships with the Globus employees (including Stephens and Bailey) and customers whom Miller and Medtronic planned to solicit.

47.     In Fall 2021, and in furtherance of their scheme, Miller, on behalf of Medtronic, met with Sharp to discuss their scheme to lift out Sharp and Globus's San Antonio sales team and bring them, and their customers, to Medtronic.   To induce Sharp to violate his NCNDA by soliciting his Globus San Antonio sales team and Globus customers, Medtronic offered Sharp substantial financial incentives, including a lucrative guarantee. Sharp quickly agreed to Miller's and Medtronic's scheme.

### In Accordance with their Scheme, Defendants Medtronic, Miller and Sharp Begin Soliciting Other Members of Globus's San Antonio Team

48.     With Sharp on board, Defendants quickly moved to execute their scheme.  Shortly after Miller's meeting with Sharp, Miller (in direct violation of his contractual obligation not to solicit Globus employees) contacted members of Sharp's San Antonio team, including Brendan Norris, Travis Scheffler, Bailey and Stephens, and solicited them to leave Globus to work with him and Sharp at Medtronic.

49.     Miller specifically used as part of his pitch that Sharp would be joining them at Medtronic and that Sharp planned to move the customers they serviced at Globus to Medtronic.

50.     Miller continuously solicited Sharp's team thereafter.

51.     In conjunction with and at the same time as Miller's solicitations, Sharp, while still employed by Globus, actively solicited his San Antonio team members to resign with him and join Medtronic, including Stephens and Bailey.

52.     On one such occasion on November 22, 2021, Sharp and Miller met with Stephens and Travis Scheffler ("Scheffler") to continue discussions about the Medtronic opportunity.  Miller

told Stephens and Scheffler that their Medtronic pay and bonuses would be much better than at Globus.  Sharp said that if Stephens and Scheffler left with him to Medtronic, Globus was likely to sue but they would not have to "sit out" the non-compete period because Medtronic would not require them to abide by the terms of their Globus NCNDAs.

53.    Sharp also explained that Medtronic would pay them a significant guarantee in exchange for their willingness to breach their NCNDA's by converting the Globus customers they serviced to Medtronic.

54.    Sharp's and Miller's actions were in furtherance of Medtronic's scheme to lift out the bulk of Globus's San Antonio sales team and steal Globus's customers in that territory in order to harm Globus and give Medtronic an unfair competitive advantage.

55.    As a result of Miller's and Sharp's solicitations, on December 17, 2021, Sharp and Stephens abruptly resigned from their employment with Globus.   Bailey resigned shortly afterwards, on January 4, 2022.   All three left to work for Medtronic as "Spinal Sales" Representatives.

56.    In Sharp's exit interview, Globus asked him where he was going to work.   He replied that he was "95% sure" he would be going to Medtronic but "may wait" because he "didn't want to work for a big company", even though he had been working for months for Medtronic's benefit and had already accepted employment at Medtronic.   Sharp's comments in his exit interview are just another example of his duplicitous and dishonest conduct.

57.    Sharp also told Globus that he hoped Globus wouldn't "try and enforce a non-compete" after he left.

58.    Shortly after resigning and in furtherance of Defendants' scheme, Sharp wiped all data from his Globus-issued iPad before returning it to Globus.  Sharp wiped his iPad in spite of

his preservation obligations, presumably to hide evidence of his and his fellow Defendants' wrongful conduct.

59.     Sharp and Stephens began employment with Medtronic on December 20, 2021, and Bailey began employment with Medtronic on January 4, 2022.

60.     Medtronic stated that it will "ensur[e] that during the restricted period [Sharp, Stephens and Bailey] do not solicit or have business contact with any restricted account, ensur[e] they do not use or disclose confidential information, and ensur[e] that they do not solicit Globus employees."

61.     Medtronic has also stated that Sharp "has not been involved in any cases or customers in the San Antonio area involving any hospital or physician with whom he engaged within his last year of employment."

62.     However, in the days following his resignation, Sharp acted as a sales representative on behalf of Medtronic at the San Antonio Military Medical Center—a hospital squarely within the San Antonio Territory—for Globus customer Dr. McDougall.  By covering a Medtronic case in Globus's territory, Sharp blatantly and flagrantly acted in violation of his NCNDA and acted contrary to Medtronic's representations.  Medtronic is actively recruiting Dr. McDougall, who is a restricted customer operating in the San Antonio territory and is on the restricted list.

63.     Medtronic's failure to require the Individual Defendants to adhere to their NCNDAs further underscores that Medtronic's scheme was premised on competing unfairly against Globus by inducing the Individual Defendants to breach their NCNDAs.  To that point, Travis Scheffler worked for Medtronic in a division other than spine before he came to work for Globus in August 2021.  Once learning about Scheffler's choice to join Globus, Medtronic

16

threatened Scheffler, telling him that the "whole Globus team is done," and that Scheffler would not have any business in San Antonio because Medtronic was going to take all of Globus's business.[4]

### Also in Accordance With Their Scheme, Medtronic Induced Miller and Sharp to Solicit and Convert Globus Customers

64.     At the same time Miller began soliciting Globus's San Antonio team, he also began soliciting Globus's customers, in violation of his contractual obligations to Globus.  For example, Miller solicited Globus customer San Antonio Military Medical Center (SAMMC) (formerly Brook Army Medical Center or "BAMC"), an account that Miller serviced while at Globus.  Miller called two surgeons at SAMMC, Dr. Jorgenson and Dr. Hall, who exclusively worked with Globus and who Miller had developed a relationship with while working for Globus.  Miller encouraged both surgeons to stop buying Globus products and begin buying Medtronic products.  As part of his pitch, Miller explained that the team who he had been working with at Globus, including Sharp, would soon be at Medtronic.

65.     Miller's solicitations of Medical Personnel at SAMMC (which is within the NCND Territory defined in his NCNDA) has been continuous from October 2021 through the present.

66.     Sharp, while still employed by Globus, also began soliciting Globus customers for the benefit of Medtronic.  Specifically, beginning in Fall 2021, Sharp began informing his

---

[4] When Scheffler first moved to Globus, Medtronic contacted Globus about Scheffler's post-employment restrictive covenants and obligations to Medtronic.  However, once Medtronic began to execute its scheme with Sharp and Miller, Medtronic stopped pressing for any restrictions on Scheffler.  During this time, Sharp, who managed Scheffler's activity at Globus, improperly and without approval instructed Scheffler to participate in cases that potentially interfered with his non-compete with Medtronic, assuring Scheffler that Medtronic would not have a problem with it since he was in talks with them to leave Globus.  Once Defendants Sharp, Stephens and Hunter resigned, and after Scheffler made it clear that he would not be moving to Medtronic, Medtronic renewed its efforts to raise restrictions against Scheffler, and accused Scheffler of violating his non-compete by participating in the cases that Sharp instructed him to participate in.

customers that he was leaving for Medtronic and that they should continue to do business with him at Medtronic, not Globus.  Sharp made specific arrangements with Globus customers he serviced to transfer their business to Medtronic and other Globus competitors immediately after Sharp resigned from Globus.

67.     Sharp's actions were in furtherance of his, Miller's and Medtronic's scheme to lift out the bulk of Globus's San Antonio sales team and steal Globus's customers in that territory in order to harm Globus and give Medtronic an unfair competitive advantage.

### During Sharp's Employment with Globus, He and Miller Worked to Convert Globus Customers to Other Globus Competitors in Exchange for Extraordinary Compensation.

68.     Sharp's and Miller's activities in recent months has not only been for the benefit of Medtronic.  In addition, they have been surreptitiously working for other competitors to obtain compensation outside of the normal scope of their employment, and in further contravention of their contractual obligations to Globus.

69.     Included in Sharp's territory was Dr. Beckman, who recently left employment at San Antonio Military Medical Center in San Antonio and moved to new employment in Denver, Colorado.  Because Dr. Beckman had a strong relationship with Sharp and an Associate Spine Specialist whom Sharp supervised, Dalton Thompson ("Thompson"), Globus arranged to move Thompson to Denver to continue supporting Dr. Beckman, and to pay Sharp commissions on continued sales to Dr. Beckman.  Sharp traveled to Denver multiple times while employed by Globus to support Dr. Beckman.  As such, Dr. Beckman remained in Sharp's territory.

70.     In recent months, and during Sharp's employment with Globus, Sharp and Miller held meetings with Dr. Beckman in Denver for the purpose of moving Dr. Beckman's business away from Globus.  Specifically, in those meetings, Sharp and Miller solicited Dr. Beckman to move his business to a distributor of ZimVie spinal products, Trilogy Mountain States ("Trilogy").

71.     Dr. Beckman has since moved his business away from Globus.

72.     Further, Sharp and Miller were compensated by Trilogy for successfully moving Dr. Beckman's business to Trilogy.

73.     On December 10, 2021, Trilogy approached Thompson and asked him if Sharp had paid him his share of commissions for Dr. Beckman's new business with Trilogy.  Trilogy also informed Thompson that it had already paid Sharp for that business.  Thompson has not received any payments from Sharp.

74.     In addition to representing Dr. Beckman on behalf of ZimVie, during his employment with Globus, Sharp began facilitating Dr. Beckman's access to and use of products from Globus competitors 4Web, BK Medical and Orthofix, and presumably continues to do so. Sharp has been selling the products of those competitors that compete directly with Globus products.  For example, Globus makes percutaneous screws.  Rather than sell Globus's screws, Sharp sourced percutaneous screws from Globus competitor ZimVie to support Dr. Beckman.

75.     Sharp has been receiving payment from ZimVie, 4Web, BK Medical and Orthofix for representing those competitors' products to Dr. Beckman.

76.     Sharp has also begun representing ZimVie in San Antonio.  While still employed by Globus, Sharp supported a surgery for one of Globus's customers—Dr. Fichtel—for ZimVie products that compete with Globus's products at Christus Santa Rosa Hospital and North Central Baptist Hospital.  Both hospitals are squarely within Sharp's NCND Territory.  Sharp has also sold ZimVie's Mobi-C artificial disc, a product that competes directly with a Globus product, to surgeons with whom he developed a relationship while employed by Globus.

77.     Sharp also has sought the assistance of a spinal product distributor operating in South Texas to help convert his former Globus customers to Medtronic and ZimVie, and to service

those customer relationships during his noncompetition period.  Essentially, the distributor would serve in a caretaker role so that Sharp may then directly service those customers when his noncompetition period with Globus expires—effectively violating his NCNDA by proxy.   In furtherance of this scheme, the distributor has recently started representing Medtronic and ZimVie at SAMMC.

78.   Sharp has also begun representing other Globus competitors in addition to Medtronic and ZimVie.  During the week of December 13, 2021, while he was still employed by Globus, Sharp provided a Globus customer, Dr. McGinley, with a spinal implant developed by Astura Medical, a direct competitor of Globus, thus purposefully diverting business from Globus.

79.   On December 16, 2021, a Globus customer, Dr. Gragnaniello was conducting a surgery using Globus implants, but Sharp and Defendant Stephens made a deal with the South Texas spinal product distributor, who also worked as a distributor for Astura, to use Astura implants instead.  Accordingly, Sharp and Stephens brought the Astura implants and not the Globus implants to the surgery. Dr. Gragnaniello complained about the situation because he had specifically requested to use Globus implants for the surgery.  However, Dr. Gragnaniello had no choice but to use the Astura implants or else he would have had to cancel the surgery.  Sharp and Stephens intentionally diverted business from Globus in favor of lining their own pockets with commissions from a competitor.

80.   Not only has Sharp been representing Globus's competitors, but he also has disparaged Globus to Globus's customers, attempting to convince them that Globus treats its employees unfairly so that those customers will stop using Globus's products and use competitors' products, including Medtronic products, instead.

81.     By working on behalf of Medtronic and other competitive spinal implant manufacturers and distributors while employed by Globus, and by conspiring to divert, and successfully diverting Globus business to other spinal implant manufacturers and distributors, Sharp engaged in unlawful conduct.

82.     Sharp and Miller engaged in this unlawful conduct in furtherance of Defendants' scheme despite being restricted from doing so by the express terms of their NCNDAs, and their actions constitute a breach of those agreements.  Sharp's conduct also constitutes a breach of his fiduciary duties.

83.     Sharp's and Miller's actions were intentional, willful and malicious.

84.     As a result of Sharp's and Miller's solicitations, Stephens and Bailey agreed to leave Globus for Medtronic and participate in the scheme to steal Globus's customers and give Medtronic an unfair competitive advantage.

85.     Stephens and Bailey, while still employed by Globus, solicited their customers to leave Globus for Medtronic, and solicited other Globus employees to leave Globus for Medtronic.

86.     By working on behalf of Medtronic while employed by Globus, Stephens and Bailey engaged in unlawful conduct.

87.     Stephens and Bailey engaged in this unlawful conduct in furtherance of Defendants' scheme despite being restricted from doing so by the express terms of their NCNDAs and their actions constitute a breach of those agreements.  Stephens's and Bailey's actions were intentional, willful and malicious.

88.     Medtronic encouraged and financially incentivized the Individual Defendants to solicit Globus customers, and actively compete against Globus, in violation of the NCNDAs, even

though Medtronic was (and is) aware of the Individual Defendants' post-employment obligations to Globus contained in the NCNDAs.

89.     The Individual Defendants' violations of their NCNDAs and Medtronic's tortious interference with those NCNDAs are likely to cause Globus substantial harm that cannot be readily quantified or fully compensated monetarily.  Globus will never know for certain what customer goodwill and confidential information Medtronic and the Individual Defendants are using to compete against Globus, and it would be extremely difficult, if not impossible to quantify the harm to Globus's business.  The loss of business would not be limited to the duration of the Individual Defendants' NCNDAs but would continue indefinitely.

90.     Since Sharp, Stephens and Bailey resigned, at least five Globus customers—surgeons whose business with Globus totaled more than $2,500,000 in 2021—have stopped using Globus's products, have not done any surgeries with Globus, and have ceased communications with Globus.  Globus expects the number of surgeons who leave Globus due to Defendants' unlawful conduct to increase.

**Globus reminds Sharp, Stephens and Bailey of their obligations under their NCNDAs**

91.     Globus sent a letter to Sharp on December 19, 2021—two days after his resignation—reminding him of his post-employment obligations in the NCNDA and requesting assurances that he intends to comply with his NCNDA.  *See* Sharp Letter, Exhibit J.  Globus sent a similar letter to Stephens on December 20, 2021 and Bailey on January 6, 2022.  *See* Stephens Letter, Exhibit K and Bailey Letter, Exhibit L.  Globus also sent a copy of each letter to Medtronic.

92.     Medtronic contacted Globus about Sharp's letter and informed Globus that Medtronic planned to move forward with his hire, though it stated that it would place him outside of his Globus territory.

22

93.     Sharp is currently working on behalf of Medtronic within his previous Globus territory and Globus believes that the other Individual Defendants are also working within their previous territories and/or servicing their Globus customers for Medtronic in violation of their NCNDAs.

### Sharp Refuses to Comply with the MMGDA and FSIAA

94.     Sharp's two MMGDAs and his FSIAA included clawback provisions which required Sharp to repay to Globus any and all monthly draw amounts in excess of $10,000 per month in compensation paid through the date of separation ("Repayment Obligation") if Sharp did not remain employed with Globus for 24 months after the February 2020 MMGDA and 18 months after execution of the February 2021 MMGDA and the October 2021 FSIAA.  *See* Exhibits G, H and I.

95.     By resigning from Globus prior to the end of his required employment period, Sharp triggered the clawback provision of his MMGDA and FSIAA.

96.     Accordingly, Sharp is obligated to repay Globus a total of $1,342,452.28

97.     Globus sent Sharp a letter on December 29, 2021 demanding repayment of the draw amounts.

98.     Thus far, Sharp has refused to repay Globus, stating "I do not feel like I owe Globus any money, let alone the 1.3+ million that is being asked of me."  Sharp's refusal to repay the draw amounts is in violation of his MMGDAs and FSIAA.

### Count I
### BREACH OF CONTRACT
### Against the Individual Defendants

99.     Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

100.     Globus and Defendant Miller executed a valid, binding, and enforceable NCNDA, the Miller NCNDA at Exhibit A.

101.     Globus and Defendant Sharp executed a valid, binding, and enforceable NCNDA, the Sharpt NCNDA at Exhibit B.

102.     Globus and Defendant Stephens executed a valid, binding, and enforceable NCNDA, the Stephens NCNDA at Exhibit C.

103.     Globus and Defendant Bailey executed a valid, binding, and enforceable NCNDA, the Bailey NCNDA at Exhibit D.

104.     The Individual Defendants entered their NCNDAs voluntarily and in consideration for their employment with Globus and incident to an employment relationship.

105.     The restrictions set forth in the Individual Defendants' NCNDAs are reasonable and necessary to protect Globus's legitimate business interests and employment relationships.

106.     The Individual Defendants violated their NCNDAs by, among other things:

a.   Engaging in prohibited competition with Globus during and after their employment;

b.   Soliciting employees of Globus to join Medtronic;

c.   Soliciting customers of Globus to purchase or use competitors' (including Medtronic's) products;

d.   Representing Globus's competitors while still employed by Globus; and

e.   Diverting Globus's business to Globus's competitors while still employed by Globus.

107.     As a direct and proximate result of their conduct, Globus has suffered and continues to suffer irreparable harm and injury, including but not limited to loss of customers, loss of

goodwill, profits, business reputation, and market share, and damages associated with employee retention costs and employee replacement costs. Globus will continue to suffer such harm and injury if the Individual Defendants are not enjoined.

108.     The Individual Defendants will continue such wrongful action unless enjoined.

**WHEREFORE**, Globus respectfully requests that this Court:

a.     Enjoin the Individual Defendants from further violations of their NCNDAs;

b.     Extend the restrictive covenants applicable to the Individual Defendants by the amount of time that they were in breach thereof;

c.     Award damages against the Individual Defendants, including but not limited to contractual and tort damages and all damages provided in the agreements (including all earnings, profits and benefits received by the Individual Defendants or Medtronic as a result of Defendants' breach) in an amount to be proved at trial;

d.     Award Globus attorney's fees as provided for in the NCNDAs;

e.     Award Globus its costs and interest; and

f.     Grant such other and further relief as this Court deems equitable, just, and appropriate.

<u>**Count II**</u>
**BREACH OF DUTY OF LOYALTY**
**Against Defendants Sharp, Stephens and Bailey**

109.     Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

110.     As employees of Globus, Defendants Sharp, Stephens and Bailey had a fiduciary duty to act solely for the benefit of Globus with respect to all matters within the scope of his employment.

111.     Globus and Medtronic are in direct competition for qualified personnel who are experienced in the spinal surgery product market.

112.     Defendants Sharp, Stephens and Bailey had a duty loyalty to Globus and breached their duty of loyalty by participating in a common scheme and engaging in acts of secret competition intended to assist themselves and Medtronic, at the expense of Globus's interests. These acts include but are not limited to soliciting Globus employees to join Medtronic and soliciting Globus customers for Medtronic's and other Globus competitor's benefit.

113.     Defendants Sharp, Stephens and Bailey have acted for the purpose of injuring Globus, which has suffered damages as a result of their actions.

114.     Defendants Sharp's, Stephens's and Bailey's actions were intentional, willful and malicious.

**WHEREFORE**, Globus respectfully requests that this Court:

a.     Award damages against Defendants Sharp, Stephens and Bailey in an amount to be proved at trial;

b.     Award punitive damages against Defendants Sharp, Stephens and Bailey;

c.     Require the disgorgement of all compensation paid by Globus to Defendants Sharp, Stephens and Bailey for all times that they were in violation of their duty of loyalty to Globus;

d.     Award Globus its costs and interest; and

e.      Grant such other and further relief as this Court deems equitable, just, and proper.

**Count III**
**TORTIOUS INTERFERENCE WITH GLOBUS'S NCNDAS**
**Defendant Medtronic**

115.    Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

116.    Globus has valid, binding and enforceable agreements with the Individual Defendants.  Medtronic is and has been aware of their NCNDAs and, by the actions described above, has interfered with those contractual agreements by encouraging, inducing, or ratifying the Individual Defendants' breach of those agreements.

117.    Defendant Medtronic is without privilege or justification in its interference with the Sharp NCNDA, the Miller NCNDA, the Stephens NCNDA and the Bailey NCNDA.

118.    This conduct has caused actual damage to Globus and was done intentionally and willfully with reckless indifference to Globus's rights.

**WHEREFORE**, Globus respectfully requests that this Court:

a.      Award damages against Defendant Medtronic in an amount to be proved at trial;

b.      Award punitive damages against Defendant Medtronic;

c.      Award Globus its costs and interest;

d.      Enjoin Medtronic from interfering with Globus employment contracts.

e.      Grant such other and further relief as this Court deems equitable, just, and proper.

**Count IV**
**UNFAIR COMPETITION**
**All Defendants**

119.    Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

120.    By the acts described above, Defendants have engaged in unfair competition.  They have used unlawful means to compete with and injure Globus by, among other things, using Globus financial resources, Globus business relationships and Globus goodwill for the benefit of Medtronic and to the detriment of Globus.  Defendants Sharp, Stephens and Bailey engaged in these actions while employed by Globus.  In sum, Defendants are reaping the rewards of Globus's substantial investment in time and money into its employees to develop its customer base, industry expertise, and goodwill.

121.    Their wrongful acts include:

a.    Improperly soliciting Globus employees to leave Globus to join Medtronic;

b.    Improperly soliciting Globus customers to stop purchasing or using Globus products and to purchase or use competitors' (including Medtronic's) products; and

c.    Inducing the Individual Defendants to breach their NCNDAs.

122.    Defendants' conduct has caused actual harm to Globus and was done intentionally and with willful, malicious and reckless indifference to the rights of Globus.

123.    As a result of Defendants' conduct, Globus has suffered and will continue to suffer substantial, immediate and irreparable harm, and damages unless Defendants are enjoined from their scheme of unlawful competition.

**WHEREFORE**, Globus respectfully requests that this Court:

a.    Award damages against Defendants in an amount to be proved at trial;

28

b.      Award punitive damages against Defendants;

c.      Require the disgorgement of all revenue earned by Medtronic as a result of its and Individual Defendants unlawful conduct.

d.      Award Globus its costs and interest; and

e.      Grant such other and further relief as this Court deems equitable, just, and proper.

### Count V
### CIVIL CONSPIRACY
### All Defendants

124.    Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

125.    By their acts described above, Defendants acted together with a common purpose to carry out their unlawful scheme, which includes breaches of the Individual Defendants' NCNDAs, unfair competition, breaches of the duty of loyalty owed by Defendants Sharp, Stephens and Bailey and tortious interference with contract, for the sole purpose of harming Globus.

126.    Each Defendant knowingly and purposely, with knowledge of their conspiracy, and with intent to further the objectives of their conspiracy, committed an overt act in pursuance of the common purpose.

**WHEREFORE**, Globus respectfully requests that this Court:

a.      Award damages against Defendants in an amount to be proved at trial;

b.      Award punitive damages against Defendants;

c.      Award Globus its costs and interest; and

d.      Grant such other and further relief as this Court deems equitable, just, and proper.

29

<u>**Count VI**</u>
**BREACH OF CONTRACT—DEFENDANT SHARP'S MMGDA and FSIAA**
**Defendant Sharp**

127.    Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

128.    Globus and Defendant Sharp executed a valid, binding, and enforceable agreement in the form of the MMGDA and FSIAA at Exhibits G, H and I.

129.    By resigning from Globus, Defendant Sharp triggered the clawback provision of the MMGDA and FSIAA, which requires Defendant Sharp to pay $1,342,452.28.

130.    Defendant Sharp has breached the MMGDA by refusing to pay.

131.    As a direct and proximate result, Globus has suffered damages.

**WHEREFORE**, Globus respectfully requests that this Court:

  a.    Enjoin Defendant Sharp from further violations of his MMGDA;

  b.    Award damages against Defendant Sharp, including but not limited to payback or "claw back" obligations in the MMGDA, as well as contractual and tort damages related to his failure to and all damages provided in the MMGDA in an amount to be proved at trial;

  c.    Award Globus its costs and interest; and

  d.    Grant such other and further relief as this Court deems equitable, just, and appropriate.

BY:          */s/ Matthew A. Fontana*
                        Charles F. Knapp (*pro hac vice* motion to be filed)
                        Matthew A. Fontana (PA ID No. 309630)
                        Conor J. Hafertepe (PA ID No. 327889)
                        FAEGRE DRINKER BIDDLE & REATH LLP
                        One Logan Square, Ste. 2000
                        Philadelphia, PA 19103-6996
                        Tel: (215) 988-2700
                        Fax: (215) 988-2757
                        *Counsel for Plaintiff Globus Medical Inc.*

Dated: January 28, 2022