**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GLOBUS MEDICAL, INC.,** | **:** | |
| **Plaintiff,** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **EDWARD SHARP et al.,** | **:** | **No. 22-383** |
| **Defendants.** | **:** | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                                    **May 18, 2022**

Before the Court is Defendant Edward Sharp's Motion for Judgment on the Pleadings as to Count VI of Plaintiff's Complaint. (ECF No. 21.) Sharp, by moving for judgment on the pleadings, in effect asks the Court to cement the meaning of the "repayment obligation" provisions in his compensation agreements at this early juncture, aided only by the language contained within the four corners of the agreements. But these agreements, sloppily drafted as they are, are far from unambiguous. And as explained below, the Court is unable to identify the intent of the parties concerning the provisions at issue due to the rampant ambiguities in each. Extrinsic evidence as produced during discovery will be needed to resolve these ambiguities. Accordingly, the Court will deny Sharp's motion at this time.

**I.      FACTUAL BACKGROUND**

**A.      Sharp's Agreements with Globus**

Globus Medical, Inc. ("Globus") is a medical device company specializing in products that assist surgeons in treating musculoskeletal disorders, specifically those necessitating spinal surgery. (Compl. ¶¶ 1, 15.) A vast network of field sales representatives market and sell Globus's medical devices to doctors and hospitals. (*Id.* ¶ 16.) To manage its sales, Globus divides the

country into regions, each of which is managed by a Vice President of Sales, and further divides these regions into areas, each managed by an Area Director. (*Id.* ¶ 17.) Globus then divides these areas into territories, each managed by a Spine Territory Manager. (*Id.*) Depending on the level of business in that territory, the Spine Territory Manager may be the sole sales representative in that territory, or they may have further sales representatives working underneath them. (*Id.*)

On January 10, 2020, Globus hired Sharp as Spine Territory Manager for the San Antonio, Texas Territory. (*Id.* ¶¶ 28-29.) As Spine Territory Manager, Sharp was tasked with "managing and further developing existing Globus customer relationships in the San Antonio Territory, developing relationships with prospective Globus customers, selling Globus products and facilitating their delivery, and managing junior sales representatives on the team." (*Id.* ¶ 30.)

As a condition of employment, Globus requires all members of its sales force, including Spine Territory Managers, to enter into No Competition and Non-Disclosure Agreements (an "NCNDA") at the time of hiring. (*Id.* ¶ 24.) Sharp did so on January 10, 2020 (the "January 2020 NCNDA"). (*Id.* ¶ 31; Compl. Ex. F.) Sharp then briefly left Globus to work for his former employer before returning to Globus on February 14, 2020. (Compl. ¶ 31.) Upon his return, he entered into a second NCNDA (the "February 2020 NCNDA"). (*Id.*) Sharp agreed to the following terms[1]:

- [D]uring the No Competition Period, I will not directly or indirectly participate in, perform services for, be employed by, own any interest in, or otherwise assist a

---

[1] Although Globus represents that Sharp's February 2020 NCNDA was attached to the Complaint as Exhibit B, (Compl. ¶ 31), Exhibit B is actually an NCNDA between Globus and Andrew Miller. Since the February 2020 NCNDA was not appended to the Complaint, these provisions have been taken from Sharp's January 2020 NCNDA. However, the Complaint alleges that "[t]he Sharp [February] NCNDA is substantively identical to the Miller NCNDA, and Sharp agreed to the same terms, including the non-competition and non-solicitation provisions." (*Id.*) The Court's review confirmed that the terms enumerated in Sharp's January 2020 NCNDA mirror the terms from Miller's NCNDA, and, therefore, Sharp's February 2020 NCNDA.

Competing Company in a position similar in responsibilities to any position I held within the Company in the last twenty-four months prior to the termination of the Relationship or in a position where I could use Confidential Information to the detriment of Globus.

- I agree not to directly or indirectly engage in any Competitive Activity with any Hospitals or Medical [Personnel] during the No Competition Period in the NCND Territory.

- During the No Competition Period, I agree not to directly or indirectly, either for my benefit or the benefit of another individual or entity, solicit, call on, interfere with, attempt to divert, entice away, service, support, sell to or market to any Hospital in the NCND Territory, or to any Medical Personnel in the NCND Territory who performs any services related to a Competing Product or Service (regardless of whether such services are also provided by the Medical Personnel outside the NCND Territory).

- During the No Competition Period, I agree not to directly or indirectly, either for my benefit or the benefit of another individual or entity, employ or offer to employ in any capacity, solicit, call on, attempt to divert, entice away or recommend for employment or contractual relationship with a Competing Company, any individuals who are or were employees, independent contractors, representatives or employees of [Globus] or any of [Globus]'s distributors at any time within the preceding 12 months.[2]

(Compl. Ex. F ¶¶ 3.1-3.3.)

The February 2020 NCNDA contained a choice of law provision mandating that it "shall be enforced as a contract of the Commonwealth of Pennsylvania because Globus's operational and worldwide headquarters are located in Pennsylvania." (*Id.* ¶ 6.5; Compl. ¶ 10.) It further stated that "that the validity, enforceability, construction and interpretation of this NCND Agreement shall be governed by the laws of the Commonwealth of Pennsylvania, without regard to its conflict of law rules." (Compl. Ex. F ¶ 6.5; Compl. ¶ 10.)

Sharp and Globus also executed three agreements concerning Sharp's compensation (collectively, the "Compensation Agreements"). On February 14, 2020, the same day the February 2020 NCNDA was executed, Sharp and Globus entered into the first of these agreements, labeled by the parties as a Minimum Monthly Guarantee Draw Agreement (the "February 2020

---

[2] Capitalized terms are defined as provided in the NCNDA.

MMGDA"). (*Id.* ¶ 32; Compl. Ex. G.) The February 2020 MMGDA also served as Sharp's offer letter. (Compl. Ex. G at 2.) It defined Sharp's territory as "[g]reater San Antonio and Austin" and provided that, for the first twelve months of Sharp's employment, his compensation would comprise a $75,000 "Base Salary [] plus commission." (*Id.* at 2, 6.) After twelve months, Sharp would no longer receive a salary and instead receive "12% [commission] on all sales split between the super territory [of Greater San Antonio and Austin]" and a minimum monthly guarantee draw ("MMGD") of "$54,167 per month for months 13-24 of employment." (*Id.* at 3.) During that period, if Sharp were to receive less "annual income"—defined as comprising Sharp's salary, commission, monthly automobile allowances, and bonuses—than the total amount he received via his MMGD payments, Globus would forgive the difference; if Sharp were to receive more annual income than the total amount he received via his MMGD payments, Sharp would keep the excess. (*Id.*)

The February 2020 MMGDA conditioned both Sharp's salary and eventual MMGD payments on "employment with Globus as an agent or direct employee for a minimum of twenty-four (24) months [] from the Effective Date [February 17, 2020]." (*Id.* at 2.) It stated that Sharp's "salary and MMGD is not earned unless this condition is met" and "[a]ny interim payments made are advances." (*Id.*) It further stated that Sharp had to repay Globus "any and all amounts in excess of $10,000 per month in compensation (Salary, Commission, Auto and all eligible Bonuses) paid through the date of separation" should he resign from Globus before February 17, 2022. This provision of the February 2020 MMGDA is reprinted in full below:

> Payment of the salary and MMGD is conditioned on employment with Globus as an agent or direct employee for a minimum of twenty-four (24) months ("Extended Term") from the Effective Date. The salary and MMGD is not earned unless this condition is met. Any interim payments made are advances. Accordingly, if you resign from Globus before the end of the Extended Term, you shall repay to Globus any and all amounts in excess of $10,000 per month in compensation (Salary,

Commission, Auto and all eligible Bonuses) paid through the date of separation ("Repayment Obligation"). By signing below, you agree to this compensation arrangement and consent to the deduction of any amounts due as a result of the Repayment Obligation above from commissions or any other monies due at separation.

(*Id.*)

On February 26, 2021, Sharp signed a second compensation agreement (the "February 2021 MMGDA"). (Compl. Ex. H.) The February 2021 MMGDA newly defined Sharp's territory as only San Antonio and directed that he "will form a super territory with Andrew Miller," another Spine Territory Manager. (*Id.* at 2; Compl. ¶ 3.) It modified his compensation to comprising "8.4% [commission] on all sales in territory" as well as MMGD payments of "$66,667 per month for the next 12 months of employment." (Compl. Ex. H at 2.) It also contained the same provision regarding Globus forgiving the difference between Sharp's MMGD payments and annual income if he received less in income than in MMGD payments, as well as Sharp keeping the difference between his MMGD payments and income if he received more in income than in MMGD payments. (*Id.*)

The February 2021 MMGDA conditioned payment of Sharp's MMGD payments "on employment with Globus as an agent or direct employee for a minimum of eighteen (18) months [] from the Effective Date [March 1, 2021]."[3] (*Id.*) Like the February 2020 MMGDA, it stated that "[t]he MMGD is not earned unless this condition is met" and "[a]ny interim payments made are advances." (*Id.*) It also imposed a repayment obligation on Sharp, stating that he had to repay Globus "any and all amounts in excess of $10,000 per month in compensation (Salary,

---

[3] Neither party has addressed how Sharp's compensation was governed between February 17, 2021—that date on which he entered his thirteenth month of employment and, presumably, his compensation changed to the commission-plus-MMGD structure as outlined in the February 2020 MMGDA—and March 1, 2021—the effective date of the February 2021 MMGDA that modified Sharp's commission-plus-MMGD compensation structure.

Commission, Auto and all eligible Bonuses) paid through the date of separation" should he resign from Globus before September 1, 2022. This provision of the February 2021 MMGDA is reprinted in full below:

> Payment of the MMGD is conditioned on employment with Globus as an agent or direct employee for a minimum of eighteen (18) months ("Extended Term") from the Effective Date. The MMGD is not earned unless this condition is met. Any interim payments made are advances. Accordingly, if you resign from Globus before the end of the Extended Term, you shall repay to Globus any and all amounts in excess of $10,000 per month in compensation (Salary, Commission, Auto and all eligible Bonuses) paid through the date of separation ("Repayment Obligation"). By signing below, you agree to this compensation arrangement and consent to the deduction of any amounts due as a result of the Repayment Obligation above from commissions or any other monies due at separation.

> (*Id.*)

On October 15, 2021, Sharp and Globus entered into a Field Sales Interim Advance Agreement (the "October 2021 FSIAA"). (Compl. Ex. I.) The October 2021 FSIAA extended the period during which Sharp would receive $66,667 MMGD payments through August 31, 2022. (*Id.* at 2.) It qualified the term "MMGD" as follows: "The MMGD is considered a draw or advance against current *and* future earned income, which includes the total of all salary, auto, commission and bonuses earned by Employee ('Earned Income')." (*Id.* (emphasis in original).) It conditioned payment of Sharp's MMGD payments on his "employment with Globus for a minimum of eighteen (18) months from the Effective Date of this Agreement [September 1, 2021]." (*Id.*) Like the other agreements, it stated that "[t]he MMGD payments are advances and are not earned unless this condition is met." (*Id.*) It also stated that Sharp could keep the difference between Sharp's earned income and the MMGD payments should he earn more in earned income. (*Id.*) The October 2021 FSIAA, however, is silent on whether Sharp would also receive either a salary or commission pursuant to its terms.

The October 2021 FSIAA also imposed a repayment obligation on Sharp. It stated that

6

Globus would forgive the difference between Sharp's earned income and MMGD payments should Sharp earn less in earned income, unless Sharp "resigns or is terminated for any reason from Globus" before March 1, 2023, in which case Sharp "is responsible to repay any and all MMGD payments in excess of $10,000 per month at the time of his separation of employment." (*Id.*) This provision of the October 2021 FSIAA is reprinted in full below:

- If the Earned Income during the MMGD Term is less than the MMGD paid during the MMGD Term, the difference will be forgiven, unless Employee resigns or is terminated for any reason from Globus before the end of the Extended Term, in which case Employee is responsible to repay any and all MMGD payments in excess of $10,000 per month at the time of his separation of employment ("Repayment Obligation").
- By signing below, Employee authorizes Globus to deduct from any amounts owed to Employee at separation of employment (including, but not limited to, any salary, commission, bonus, car allowance and expense reimbursement) the full amount of Employee's Repayment Obligation and Employee's repayment obligations under other agreements. Such deductions shall be in addition to other legal and equitable remedies available to Globus to collect the amounts Employee owes under his Repayment Obligation and his repayment obligations under other agreements.
- Nothing in this Agreement is intended to waive or otherwise modify Employee's repayment obligations under the letter agreements dated December 20, 2019 and February 26, 2021.[4]

(*Id.*)

None of the Compensation Agreements contain a choice of law provision.

**B.      Sharp Leaves Globus and Joins Medtronic**

Globus terminated Miller's employment in April 2021. (Compl. ¶ 43.) Six weeks later, he was hired by Medtronic[5] as a sales representative in the San Antonio area. (*Id.* ¶ 44.) At some point in the fall of 2021, Miller met with Sharp to recruit him to Medtronic. (*Id.* ¶ 47.) Miller also

---

[4] The parties did not provide the Court with the December 20, 2019 agreement and it is not at issue.

[5] As used here and in the Complaint, "Medtronic" collectively refers to defendants Medtronic Inc. and Medtronic USA Inc.

recruited members of Sharp's Globus sales team, including Hunter Bailey and Brooke Stephens. (*Id.* ¶ 48.) Miller continued to engage Sharp and his team in the ensuing months, promising them bonuses and financial incentives if they went to Medtronic. (*Id.* ¶¶ 47-53.)

On December 17, 2021, Sharp resigned from Globus. (*Id.* ¶ 55.) He began employment with Medtronic as a Spinal Sales Representative in the San Antonio area on December 20, 2021. (*Id.*)

On December 29, 2021, Globus sent Sharp a letter demanding repayment of $1,342,452.28 in connection with monies provided to him pursuant to the Compensation Agreements. (*Id.* ¶¶ 96-97.) To this day, Sharp has not repaid any amount to Globus. (*Id.* ¶ 98.)

## II.    PROCEDURAL HISTORY

On January 28, 2022, Globus filed suit against Sharp, Miller, Bailey, Stephens, and Medtronic. It asserted four causes of action, including a breach of contract claim against only Sharp in connection with the Compensation Agreements. (*Id.* ¶¶ 127-31.) Sharp, Miller, Bailey, and Stephens answered the Complaint, and Sharp and Miller asserted counterclaims against Globus, on March 4, 2022. (ECF No. 22.) Also on March 4, 2022, Sharp filed the instant motion for judgment on the pleadings in connection with the aforementioned breach of contract claim. (ECF No. 21.) Globus opposed Sharp's motion on March 28, 2022, and Sharp replied on April 4, 2022. (ECF Nos. 29, 32.)

Medtronic answered the Complaint on March 9, 2022. (ECF No. 22.) Globus answered Sharp and Miller's counterclaims on March 25, 2022. (ECF No. 28.) On March 22, 2022, the parties jointly petitioned the Court to issue a stipulated preliminary injunction that, *inter alia*, would prevent Sharp, Miller, Stephens, and Bailey from performing certain types of work for Medtronic until various dates in late 2022 and early 2023. (ECF No. 26.) The Court entered the

preliminary injunction on March 22, 2022. (ECF No. 27.)

## III.   LEGAL STANDARD

Sharp moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Motions for judgment on the pleadings are governed by the same standard as Fed. R. Civ. P. 12(b)(6) motions to dismiss for failure to state a claim. *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). This requires a court to accept as true all factual allegations in the complaint and any exhibits thereto and draw all reasonable inferences in favor of the non-moving party. *Wolfington v. Reconstructive Orthopedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019); *Bd. of Trs. of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 272 (3d Cir. 2001). To survive, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Accordingly, a court will only grant a motion for judgment on the pleadings if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Sprague v. Am. Bar Ass'n*, Civ. A. No. 01-382, 2001 WL 1450606, at *1 (E.D. Pa. Nov. 14, 2001).

## IV.   DISCUSSION

Count VI of the Complaint asserts that Sharp breached the Compensation Agreements' repayment obligation provisions. Specifically, Globus alleges that Sharp's resignation triggered the Compensation Agreements' "clawback provisions," requiring Sharp to pay back Globus $1,342,452.28 in advanced monies. (Compl. ¶¶ 94-95.)

Both Sharp and Globus agree that, because the Compensation Agreements do not contain choice of law provisions, the Court must determine which state's law governs their dispute before moving to the enforceability of the repayment obligation provisions. Sharp argues that Texas law governs, while Globus argues that Pennsylvania law governs.

This case, however, presents a unique quandary in that the first step of the Court's choice of law analysis—determining whether there is an "actual conflict" in how each state would treat the Compensation Agreements—depends on what *types* of agreements are at issue. As discussed below, certain types of agreements, including types potentially at issue here, are subjected to a more exacting level of scrutiny in one state as compared to the other, which would result in an actual conflict. But other types of agreements are treated the same.

Unsurprisingly, the parties deviate appreciably in their characterizations of the Compensation Agreements. Globus, on one hand, views the Compensation Agreements as "forgivable loan agreements" and, as such, the repayment obligation provisions govern "voluntary loans" that Sharp agreed to pay back should he depart Globus before a certain amount of time elapses. (ECF No. 29 at 3, 8.) On the other hand, Sharp views the Compensation Agreements as, essentially, non-compete agreements, and the repayment obligation provisions contained within as thinly veiled covenants not to compete, penalizing Sharp for invoking his right as an at-will employee to leave his job. (ECF No. 21-1 at 7.)

In any event, at this juncture, the Court is unable to definitively say what the type of agreements are at issue given their ambiguities. In other words, the repayment obligation provisions are all "reasonably susceptible to more than one interpretation": as either requiring the repayment of loan-type payments or constituting potentially penal liquidated damages provisions. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). As such, a circular issue emerges: the Court must perform a choice of law analysis to determine whether Pennsylvania or Texas law governs the parties' dispute arising out of the Compensation Agreements. To determine whether Pennsylvania or Texas law governs, the Court must determine whether there is an actual conflict

pursuant to Pennsylvania's choice of law analysis. To determine whether there is an actual conflict, the Court must interpret the Compensation Agreements to determine what type of contract is at issue and whether they would be treated differently under Pennsylvania and Texas law. Before interpreting the Compensation Agreements, the Court must determine whether Pennsylvania or Texas law governs its interpretation of the Compensation Agreements given their ambiguities. And the cycle begins anew.

Nevertheless, no matter what the Compensation Agreements or repayment obligation provisions *are*, the Court can conclusively state that Pennsylvania law will govern the parties' dispute arising out of the Compensation Agreements.

The Court will address the issues presented by Sharp's motion in reverse. First, the Court will outline the ambiguities contained within each of the Compensation Agreements to demonstrate why both Sharp and Globus's characterizations are reasonable, necessitating the introduction of extrinsic evidence. Next, the Court will apply Pennsylvania's choice of law analysis to the Compensation Agreements to demonstrate why Pennsylvania law governs regardless of what type of provision is at issue.

A.      **The Compensation Agreements' Ambiguities**

When interpreting a contract, a court begins with the "firmly settled" principle that "the intent of the parties to a written contract is contained in the writing itself." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)). Whether a contract or the terms and provision contained within are ambiguous is a question of law to be determined by the court. *Patel v. Dhaduk*, 839 F. App'x 715, 718 (3d Cir. 2020) (citing *In re Somerset Reg'l Water Res., LLC*, 949 F.3d 837, 845 (3d Cir. 2020)). "'When the words are clear and unambiguous,' the intent of the parties must be determined

'from the express language of the agreement'" without looking outside the contract. *Am. Eagle Outfitters*, 584 F.3d at 587 (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). When provisions in a contract are found to be ambiguous, meaning "they are subject to more than one reasonable interpretation when applied to a particular set of facts," the court may look to extrinsic evidence to identify the intent of the parties and meaning of the contract. *Glenn Distrib. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d. Cir. 2002); *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). A contract is not ambiguous if the court can determine its meaning without any guide other than "a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp.*, 247 F.3d 79, 93 (3d Cir. 2001). A contract is also not rendered ambiguous by the mere fact that the parties do not agree on the proper construction. *Id.*

Here, for the reasons set forth below, the Court finds that all three of the Compensation Agreements are ambiguous. It addresses each in turn.

### 1.   February 2020 MMGDA

The February 2020 MMGDA states that, for the first twelve months of Sharp's employment with Globus, his "compensation will consist of a Base Salary ('Base') plus commission, according to the schedule in Appendix A."[6] (Compl. Ex. G at 2.) Appendix A to the February 2020 MMGDA provides for a $75,000 monthly base salary. (*Id.* at 6.) For months thirteen through twenty-four, the February 2020 MMGDA provides for Sharp to receive a $54,167 MMGD payment plus commission. (*Id.* at 3.) It conditions payment of Sharp's "salary and MMGD" on employment with Globus for twenty-four months, stating that "[t]he salary and

---

[6] The Court notes that Base Salary is abbreviated as "Base," but the abbreviation "Base" is never used throughout the February 2020 MMGDA.

MMGD is not earned unless this condition is met. Any interim payments made are advances." (*Id.* at 2.) It then states that, should Sharp resign from Globus within twenty-four months, he must "repay to Globus any and all amounts in excess of $10,000 per month in compensation (Salary, Commission, Auto and all eligible Bonuses) paid through the date of separation []." (*Id.*)

Here, the term "salary" is ambiguous. Although the February 2020 MMGDA states that Sharp first receives a monthly "salary," and then, a year later, MMGD payments—seemingly distinguishing the two forms of payment—the Court can discern no obvious difference between the way they are treated under the agreement. The February 2020 MMGDA states that Sharp's "salary" and his MMGD are both "not earned" until Sharp is employed by Globus for twenty-four months. (*Id.*) It also states, in the following sentence, that "[a]ny interim payments are advances," without differentiating between the payment of the salary and the MMGD. (*Id.*) By that logic, Sharp's $75,000 monthly salary he received between February 2020 and February 2021 was an "advance" and, in view of his December 2021 resignation, was never earned—exactly like his MMGD payments.

However, the February 2020 MMGDA states that Sharp's "salary" is part of both his "compensation" and "annual income," in addition to his commission, automobile payments, and bonuses, without mentioning MMGD payments. (*Id.* ("compensation (Salary, Commission, Auto and all eligible Bonuses)"); *id.* at 3 ("annual income under the compensation plan listed in this offer (Salary, Auto, Commissions and all eligible Bonuses)"). So does the February 2021 MMGDA. (Compl. Ex. H at 2 (same).) And both the February 2020 and February 2021 MMGDAs use the word "earned" in connection with Sharp's "income." (*See* Compl. Ex. G at 3 ("If all calculated annual income under the compensation plan listed in this offer (Salary, Auto, Commissions and all eligible Bonuses) is greater than the MMGD paid, the excess amount *earned* will be paid

out . . .") (emphasis added); Compl. Ex. H at 2 (same).) Muddling things further is the October 2021 FSIAA, which specifically defines the term "Earned Income" as comprising "the total of all salary, auto, commission and bonuses earned by [Sharp]." (Compl. Ex. I.) And yet the February 2020 MMGDA says that Sharp's "salary" is "not earned." (Compl. Ex. G at 2.)

Sharp's "salary" was not addressed by either party in their submissions, providing further support that it would be inappropriate to grant judgment on the pleadings at this time. The February 2020 MMGDA is also an afterthought in the Complaint. Curiously, the Complaint does not even make it clear to what extent Globus seeks to enforce the February 2020 MMGDA. When first mentioning the allegations that provide support for Count VI, Globus writes that "Sharp's two MMGDAs and his FSIAA included clawback provisions which required Sharp to repay to Globus any and all *monthly draw amounts* in excess of $10,000 per month in compensation paid through the date of separation [] if Sharp did not remain employed with Globus for 24 months after the February 2020 MMGDA and 18 months after execution of the February 2021 MMGDA and the October 2021 FSIAA." (Compl. ¶ 94 (emphasis added).) But both MMGDAs say that Sharp "shall repay to Globus any and all *amounts* in excess of $10,000 per month," not "monthly draw amounts." (Compl. Ex. G at 2; Compl. Ex. H at 2.) And unless Globus only seeks to enforce the February 2020 MMGDA as it governed Sharp's compensation during the twelve days between February 17, 2021—the start of Sharp's thirteenth month of employment—and March 1, 2021— the date on which the February 2021 MMGDA took effect—the February 2020 MMGDA implicates only the repayment of Sharp's *salary*. Put differently, it is not certain whether Sharp ever received any MMGD payments pursuant to the terms of the February 2020 MMGDA; however, he certainly received a monthly salary pursuant to the February 2020 MMGDA between February 17, 2020 and, at least, February 17, 2021.

14

Moreover, when describing Count VI in the Complaint, Globus states only that "[b]y resigning from Globus, Defendant Sharp triggered the clawback provision of the MMGDA and FSIAA, which requires Defendant Sharp to pay $1,342,452.28." (Compl. ¶ 129.) It is not clear why "MMGDA" is singular here when, only a few paragraphs earlier, Globus referred to the "clawback provisions" in "Sharp's two MMGDAs." (*Id.* ¶ 94.) Additionally, Globus requests that the Court "[a]ward damages against Defendant Sharp, including but not limited to payback or 'claw back' obligations in the MMGDA." (*Id.* ¶ 131.) It is again not clear again why "MMGDA" is singular here, or why the October 2021 FSIAA is not mentioned at all.

Whether Sharp contracted away his ability to earn a "salary" in the February 2020 MMGDA, and whether Globus actually seeks the repayment of that "salary," is an open question that the Court anticipates the parties will address as this case progresses. At this time, however, the Court is unable to opine on the February 2020 MMGDA until the ambiguity inherent in the term "salary" is resolved.

2.     The February 2021 MMGDA

The February 2021 MMGDA states that Sharp will receive a MMGD of "$66,667 per month for the next 12 months of employment." (Compl. Ex. H at 2.) It conditions payment of Sharp's MMGD on employment with Globus for eighteen months. (*Id.*) It further states that "[t]he MMGD is not earned unless this condition is met. Any interim payments made are advances." (*Id.*) It then states that, should Sharp resign within eighteen months, he must "repay to Globus any and all amounts in excess of $10,000 per month in compensation (Salary, Commission, Auto and all eligible Bonuses) paid through the date of separation []." (Compl. Ex. G at 2.)

Here, the term "any and all amounts in excess of $10,000 per month in compensation (Salary, Commission, Auto and all eligible Bonuses) paid through the date of separation" is

ambiguous because it is not clear what monies, exactly, the February 2021 MMGDA calls for Sharp to "repay to Globus" should he resign.[7] Instead, the agreement's plain language provides for multiple reasonable interpretations.

One potential interpretation is that Sharp must repay to Globus any and all monies he received in connection with his work, but he may retain $10,000 of those monies he received from compensation-related sources. For example, if Sharp received $100,000 between his commission, automobile payments, and bonuses one month, in addition to a $66,667 MMGD payment, he must repay to Globus $156,667. If Sharp received $5,000 between his commission, automobile payments, and bonuses one month, in addition to a $66,667 MMGD payment, he must repay $66,667. Globus repeatedly insists that it seeks "not a dime more than it advanced to Sharp." (ECF No. 29 at 14.) But under this reasonable interpretation, Sharp would be required to pay Globus an *uncapped* amount possibly far greater than his MMGD payments, comprising the repayment of his commission and other forms of compensation. This would constitute a liquidated damages provision and, potentially—as Sharp argues—a penalty for his departure.

Another potential interpretation is that Sharp must repay to Globus the difference between $10,000 and the total amount of his compensation, capped at the amount of his MMGD payments. So if Sharp earned $100,000 between his commission, automobile payments, and bonuses one month, in addition to a $66,667 MMGD payment, he would repay $66,667. If Sharp earned $15,000 between his commission, automobile payments, and bonuses one month, in addition to a $66,667 MMGD payment, he would repay $5,000. If Sharp earned $5,000 between his

---

[7] The Court disappointingly notes that neither party provided a breakdown showing how Globus arrived at the $1,342,452.28 amount it requests in connection with the Compensation Agreements, as well as how much of that sum stems from each agreement. This would greatly assist the Court in determining whether Globus seeks only the repayment of advanced monies, as it insists, or Sharp's earnings, as he insists.

commission, automobile payments, and bonuses one month, in addition to the $66,667 MMGD payment, he would repay $0. This interpretation would more readily comport with Globus's insistence that it only seeks the repayment of advanced monies, since the funds repaid to Globus would only be sourced from the pool of Sharp's MMGD advances. It would use his compensation as a measuring stick for the repayment amount, but it would not require the repayment of any earned income.

Extrinsic evidence, as uncovered during the discovery process, will be necessary to resolve the ambiguity inherent in the February 2021 MMGDA. As such, judgment on the pleadings in connection with this agreement is not appropriate at this time.

        3.    October 2021 Agreement

The October 2021 FSIAA states that, effective September 1, 2021, Sharp will receive an MMGD "against sales compensation [] in the amount of $66,667 per month" subject to the conditions set forth in the agreement. (Compl. Ex. I.) It also states that Sharp's MMGD payments are "considered a draw or advance against current *and* future earned income," defining "Earned Income" as "the total of all salary, auto, commission and bonuses earned by Employee." (*Id.* (emphasis in original).) Like the February 2021 MMGDA, the October 2021 FSIAA conditions payment of Sharp's MMGD on employment with Globus for eighteen months following the effective date of the agreement and states that "[t]he MMGD payments are advances and are not earned unless this condition is met." (*Id.*) It then states that if Sharp's "Earned Income . . . is less than the MMGD paid" between September 1, 2021 and August 31, 2022, "the difference will be forgiven, unless Employee resigns or is terminated for any reason from Globus before the end of the Extended Term, in which case Employee is responsible to repay any and all MMGD payments in excess of $10,000 per month at the time of his separation of employment." (*Id.*)

Of all the agreements at issue, it is most clear that the October 2021 FSIAA seeks the repayment of, specifically, Sharp's "advance[d]" "MMGD payments." (*Id.*) However, the October 2021 FSIAA is still ambiguous, as is not clear whether this provision seeks the repayment of Sharp's MMGD payment minus $10,000 (*i.e.*, $56,667 per month), or $66,667 per month since the MMGD payment as a whole is greater than $10,000 (as compared to, *e.g.*, agreements signed by other employees involving lower MMGD payments).

Further, the October 2021 FSIAA does not provide for Sharp to continue to receive a commission or any other type of non-MMGD monies from Globus pursuant to its terms. In contrast, Sharp's MMGDAs each established a percentage of commission that Sharp would receive. (Compl. Ex. G at 3; Compl. Ex. H.) The silent October 2021 FSIAA states that its terms serve as an "alternative to [Sharp's] current compensation structure," suggesting it modified and did away with the whole of the February 2021 MMGDA. (Compl. Ex. I.) It is entirely possible that Sharp was only bringing in MMGD monies during this time.

However, the October 2021 FSIAA also states that Sharp's MMGD payments are advances "against current . . . earned income," suggesting the existence of some sort of non-MMGD "income." (*Id.*) The October 2021 FSIAA also contains a provision governing the forgiveness of Sharp's repayment obligation "if Earned Income . . . is less than the MMGD paid," as well as Sharp's ability to keep MMGD-associated monies "if the Earned Income . . . is greater than the MMGD paid," providing further support for this "income." But that is not unambiguous based on the plain language of the agreement. This further calls into question whether the MMGD payments here are "voluntary loan[s]" or are, in reality and as Sharp believes, "income that Mr. Sharp had earned at the time he drew it." (ECF No. 29 at 3; ECF No. 32 at 2.)

Separately, the Court is troubled by the fact that the October 2021 FSIAA calls for Sharp

to repay monies to Globus if he "resigns or is *terminated for any reason*" prior to August 31, 2022. (Compl. Ex. I (emphasis added).) Theoretically, then, if Globus were to terminate Sharp on August 30, 2022 for any reason (or no reason) at all, he would be "responsible to repay any and all MMGD payments in excess of $10,000 per month." (*Id.*) This phrasing is different than that found in the MMGDAs: both of those state that employment with Globus for a certain amount of time is a general condition to receive Sharp's salary or MMGD payments, but Sharp "shall repay to Globus" monies "if [he] *resign[s]* from Globus." (Compl. Ex. G at 2 (emphasis added); Compl. Ex. H at 2 (same).) Neither party has briefed the enforceability of a provision like this, as the Court anticipates they will do at a later stage in this action.

The Court finds that discovery is needed to resolve the Compensation Agreements' ambiguities. Therefore, Sharp's motion for judgment on the pleadings is denied at this time.

**B.  Choice of Law**

Regardless if the parties ultimately demonstrate that the repayment obligation provisions govern loan-type payments or liquidated damages, Pennsylvania law applies to their dispute to the extent it arises out of the Compensation Agreements.

The Compensation Agreements do not contain choice of law provisions, necessitating a choice of law analysis. A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Because this court sits in the Eastern District of Pennsylvania, Pennsylvania choice of law rules apply.

In contracts cases, Pennsylvania calls for a court employ a flexible, "interest/contacts" methodology to resolve choice of law questions. *Id.* at 226-27. First, the court determines whether an actual conflict exists between the laws of competing states. *Id.* at 230. In doing so, the court

must examine the substance of the potentially applicable laws to identify "whether these states would actually treat this issue any differently." *Id.* If the application of the proposed laws would not lead to different results, the court applies the law of the forum state and no further analysis is necessary. *Broederdorf v. Bacheler*, 129 F. Supp. 3d 182, 193 (E.D. Pa. 2015) (citing *State Farm Fire & Cas. Co. v. Holmes Prods.*, 165 F. App'x. 182, 185 (3d Cir. 2006)); *Pasternack v. Klein*, Civ. A. No. 14-2275, 2017 WL 4642283, at *1-*2 (E.D. Pa. Oct. 17, 2017). But if the competing laws produce different results, the court must perform an "interest analysis" of the policies of the interested states and "classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation.'" *Hammersmith*, 480 F.3d at 230.

The Court will perform two choice of law analyses. First, it will treat the repayment obligation provisions as though they govern the repayment of loan-type payments. Next, it will treat the repayment obligation provisions as though they call for the repayment of Sharp's earnings beyond the MMGD payments, *i.e.*, as liquidated damages provisions. Either way, Pennsylvania law applies.

       1.    <u>Loan-type Payments</u>

         *a.    Actual Conflict*

Globus argues that the Compensation Agreements are "Draw Agreements" or "forgivable loan agreements." Accordingly, it asserts, the provisions governing Sharp's MMGD payments are "Loan Repayment" and "draw repayment" provisions, and the MMGD payments themselves are "loans." (*See, e.g.*, ECF No. 29 at 4-8.)

Pursuant to the first step of Pennsylvania's choice of law analysis, the Court will review the laws of Texas and Pennsylvania to determine whether the "application of each state's substantive law produces a contrary result" and an actual conflict exists. *Rose v. Dowd*, 265 F.

Supp. 3d 525, 530 (E.D. Pa. 2017). Sharp argues that an actual conflict exists because, even if the repayment obligation provisions govern the repayment of loan-type payments, Texas would treat them as covenants not to compete, subjecting them to Texas's "restrictive covenant standard of reasonableness" analysis to determine their enforceability. (ECF No. 21 at 5-7.) Globus, meanwhile, claims that no actual conflict exists because both Texas and Pennsylvania courts "routinely enforce draw repayment provisions like the Draw Agreements' Loan Repayment Provisions and do not apply a reasonableness standard to determine validity and enforceability." (ECF No. 29 at 8.) Both parties concede that they are unaware of any case in which a court applying Pennsylvania law applied a reasonableness standard to agreements requiring the repayment of a forgivable draw or loan. (ECF No. 21-1 at 9; ECF No. 29 at 29.)

The Court finds that there is an actual conflict between Texas and Pennsylvania law concerning the way each state would address provisions governing loan-type payments like those Globus believes are contained in the Compensation Agreements. Texas courts would treat them as covenants not to compete and analyze them as such. But Pennsylvania courts would not. Instead, in Pennsylvania, courts "follow generally applicable rules of contract interpretation . . . [i]n interpreting a contract under which money is advanced to a salesman." 19 Michele M. Hughes, Summ. Pa. Jur. 2d Emp. & Lab. Rel. § 3:5 (2d ed. 2022) (citing *Banks Eng'g Co. v. Polons*, 752 A.2d 883 (Pa. 2000)).

The Texas Supreme Court's *Haass* decision and the Texas Court of Appeals' *Rieves* decision are instructive. The Texas Business and Commerce Code states that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful." Tex. Bus. & Com. Code Ann. § 15.05(a). And the Texas Supreme Court has held that "[c]ovenants that place limits on former employees' professional mobility . . . are restraints on trade." *Marsh USA Inc. v. Cook*, 354

S.W.3d 764, 768 (Tex. 2011). Pursuant to an exception established by the Texas Business and Commerce Code, however, a covenant is enforceable if "it contains limitations as to time, geographical area, and scope of activity to be restrained that are *reasonable* and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code Ann. § 15.50 (emphasis added).

In *Haass*, the Texas Supreme Court held that this reasonableness standard governs provisions in agreements that "impose a severe economic penalty on a departing employee." *Rieves v. Buc-ee's Ltd.*, 532 S.W.3d 845, 851 (Tex. Ct. App. 2017) (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991)); *Haass*, 818 S.W.2d at 382 ("We hold that a damages provision affecting the right to render personal services operates as a restraint of trade and must be judged by the reasonableness standards for covenants not to compete."). Specifically, the Texas Supreme Court determined that a provision of an agreement that required a former partner to pay damages for soliciting or furnishing accounting or related services to the partnership's clients for twenty-four months after his termination constituted an unreasonable restraint of trade since "[t]he practical and economic reality of such a provision is that it inhibits competition virtually the same as a covenant not to compete." *Haass*, 818 S.W.2d at 385-86. The Court further opined that, for the reasonableness standard to apply, the agreement need not contain an "express provision that the departing partner or employee is prohibited from competing": what matters is "[i]f the damages provided are sufficiently severe, then the economic penalty's deterrent effect functions as a covenant not to compete as surely as if the agreement expressly stated that the departing member will not compete." *Id.* at 385.

More recently, the Texas Court of Appeals extended this principal to a provision in an agreement concerning advanced monies. *Rieves* involved an at-will employee who agreed to a

compensation structure comprising, initially, both an hourly wage and a fixed monthly bonus. *Rieves*, 532 S.W.3d at 847. Her compensation agreement required that she pay back her bonuses to her employer if either she or her employer terminated her employment within sixty months of her start date, or if she failed to provide a six-month separation notice in the event she resigned. *Id.* The following year, the employee and employer executed a modified compensation agreement under which the employee would receive a weekly salary and be "advanced a monthly retention payment." *Id.* at 847. Like the earlier agreement, the employee was required to pay back her retention pay if either she or her employer terminated her employment within forty-eight months of the effective date of the new agreement, or if she failed to provide a six-month separation notice in the event she resigned. *Id.* The second agreement stated that the employee would only "earn" her retention payments if those conditions were met. *Id.* The employee ultimately left her employment after approximately thirty-six months. *Id.* at 848.

Applying *Haass*, the Texas Court of Appeals treated the repayment obligation provisions in both agreements as covenants not to compete because the "provisions impose a severe economic penalty on [the employee] if she exercises her right as an at-will employee to quit her employment." *Id.* at 851 (citing *Haass*, 818 S.W.2d at 388). The Texas Court of Appeals then determined that the provisions constituted unreasonable restraints of trade since the "provisions impose no limits on [the employee's] repayment obligation based on whether her new employment involves certain competitive activities or is located within certain areas."[8] *Id.*

---

[8] *Byun*, cited by Globus, is less convincingly analogous than *Rieves*. First, the "advance agreement" in *Byun*—whose full text is unavailable, but, as reprinted in the opinion, states that "[employer] shall advance to [employee] the difference when the gross income for [employee] falls below $4,200 per month"—involved "advances against unearned commissions." *Byun v. Hong*, 641 S.W.3d 821, 825 (Tex. Ct. App. 2022). Here, the October 2021 FSIAA clearly defines MMGD payments as advances against "current . . . income." (Compl. Ex. I.) Additionally, although the employee in *Byun* challenged the reasonableness of his non-compete agreement and

Here, should the Court find that they govern loan-type payments, the Court predicts that the Texas Supreme Court would also treat the Compensation Agreements' repayment obligation provisions as covenants not to compete, subjecting them to a reasonableness analysis. Specifically, the Compensation Agreements' purported requirements that Sharp must repay $1,342,462.28 to Globus would, in Texas, constitute a "sufficiently severe . . . economic penalty[]" warranting this treatment, even if only the repayment of "advanced" funds is implicated. *See Haass*, 818 S.W.2d at 384 (finding $126,000 in damages to constitute a sufficiently severe economic penalty); *Rieves*, 532 S.W.3d at 848 (finding $66,720.29 in damages to constitute a sufficiently severe economic penalty). Indeed, since *Haass*, Texas courts have extended to this treatment more broadly to contractual provisions imposing "sufficiently severe economic penalties" on departing employers, even if they are not "express provision[s] that the departing partner or employee is prohibited from competing." *Haass*, 818 S.W.2d at 385. *Rieves* demonstrates this, as the Texas Court of Appeals applied the reasonableness standard to a provision dictating that an employee may only "earn [her advanced monthly payments]" by remaining with her employer for a set amount of time.[9] *Id.* at

---

not his advance agreement, notably, the advance agreement did not condition any advances on the employee's continued employment. *Byun*, 641 S.W.3d at 826-28. The agreement in *Rieves*, however, did, as did the Compensation Agreements at issue here. Instead, the *Byun* employee invoked only the Texas Labor Code in challenging his advance agreement, asserting that his employer improperly "withheld [his] wages" rendering the entire advance agreement "illegal." *Id.* at 828-29. The Texas Court of Appeals ultimately found that there was no private cause of action for breach of contract under the chapter of the Texas Labor Code cited by the employee, and that the employee had failed to file the appropriate administrative claim with the Texas Workers Commission. *Id.* at 829-30.

[9] Although Globus insists that *Rieves* is inapposite because its holding is limited to "apply[ing] a reasonableness standard to a disgorgement penalty provision that requires an employee to return bonus payments which were compensation for time actually worked," Globus does not once address *Rieves*' second agreement—which contains a provision concerning advanced monthly payments. It is as though Globus conveniently stopped reading the case in the middle of page 348. Globus also, bizarrely, misspells the case's name every time it is cited in its brief.

24

847. Similarly, the February 2021 MMGDA and October 2021 FSIAA both state that Sharp's MMGD payments are only "earned" should he remain with Globus for eighteen months from the effective dates of each agreement.[10] (Compl. Ex. H; Compl. Ex. I.)

Therefore, there is an actual conflict in how loan-type repayment provisions are treated and analyzed under Pennsylvania and Texas law. The Court accordingly proceeds to the second step of Pennsylvania's choice of law analysis.

### b.       Type of Conflict

Whether a conflict is true or false depends on each state's interest in having its law applied. A false conflict occurs when "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 107 (Pa. Super. Ct. 2015) (citing *Hammersmith*, 480 F.3d at 230). When there is a false conflict, the court applies the law of the interested state. *Id.* A true conflict occurs when "*both* jurisdictions' interests would be impaired by the application of the other's laws." *Hammersmith*, 480 F.3d at 230 (emphasis in original). When there is a true conflict, a "deeper choice of law analysis is necessary" and the court must then determine which state has the "greater interest in the application of its law." *Id.* at 230-31.

The Court finds that a true conflict exists. Both parties agree that there is no Pennsylvania case law supporting the proposition that loan-type repayment provisions would be treated as a

---

Even so, Globus also attempts to distinguish the first agreement in *Rieves* by arguing that the repayment obligation provisions in the Compensation Agreements are advances against only Sharp's *future* earned income. However, as repeatedly highlighted in this Opinion, the most recent October 2021 FSIAA states that "[t]he MMGD is considered a draw or advance against current *and* future income." (Compl. Ex. I (emphasis in original)). Oddly, Globus omits the word "current" when referring to the October 2021 FSIAA throughout its brief.

[10] As discussed above, whether Sharp's "salary" as provided for by the February 2020 MMGDA is an "advance" is to determined following discovery.

restraint on trade or face additional judicial scrutiny. Meanwhile, Texas applies the restrictive covenant reasonableness standard to such provisions so long as they constitute sufficiently severe economic penalties. This enhanced scrutiny demonstrates that Texas law would more likely disfavor enforcing the Compensation Agreements' repayment obligation provisions should they actually be loan-type repayment provisions, while Pennsylvania treats such provisions in a "neutral" matter, like any other contract. *See Banks*, 752 A.2d at 886. Although Sharp is correct that Pennsylvania courts generally disfavor "contracts in restraint of trade that prevent a former employee from earning a livelihood," he ignores his own argument that Pennsylvania courts do not and have not considered loan-type repayment provisions to be restraints of trade. (ECF No. 21-1 at 11.)

Because both states' interests are implicated on the facts of this case, the Court must determine which state has the most significant relationship to this dispute.

c.       *Contacts and Interest Analysis*

If a true conflict exists, the Court must then determine which state has the "greater interest in the application of its law." *Hammersmith*, 480 F.3d at 231. This determination requires the Court to weigh the contacts each state has with the dispute on a qualitative scale, and to "consider the interests and policies that may validly be asserted by each jurisdiction." *Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 438-39 (3d Cir. 2012) (citing *Hammersmith*, 480 F.3d at 235). Pennsylvania courts have adopted the approach of the Restatement (Second) of Conflict of Laws and consider the following contacts relevant to this determination: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicil, residence, nationality, place of

incorporation and place of business of the parties."[11] Restatement (Second) of Conflict of Laws § 188. Consideration of those factors "requires more than a mere counting of contacts. Instead, [the court] must weigh the contacts on a qualitative scale according to the policies and interests underlying the particular issue." *Pac. Emps.*, 693 F.3d at 436-37.

Here, Pennsylvania has a greater interest in the application of its law than does Texas. Although Sharp performed his Spine Territory Manager work in Texas, Globus is headquartered in Pennsylvania, and Sharp accepted employment with a Pennsylvania employer.[12] Should Sharp be required to repay Globus, the amounts are due to a Pennsylvania company.

Further, Sharp executed his February 2020 MMGDA on February 14, 2020, the same day he executed his February 2020 NCNDA. The February 2020 NCNDA was "required . . . as a condition of [Sharp's] employment." (Compl. ¶ 31.) The February 2020 NCNDA has a Pennsylvania choice of law provision, the validity and enforceability of which neither party disputes. Generally, the law of the state chosen by the parties in a choice of law provision will be honored and applied. *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (citing Restatement (Second) of Conflict of Laws § 187); *3D/Int'l, Inc. v. Romano*, 811 F. App'x 244, 248 (5th Cir. 2020) (citing Restatement (Second) of Conflict of Laws § 187). "[W]hen two writings are executed

---

[11] Courts consider those contacts in light of the general principles governing choice of law analysis. Those principles are outlined in § 6 of the Restatement and include: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6.

[12] Although not alleged in the Complaint, Globus also represents in its opposition brief that the Compensation Agreements were negotiated, drafted, and approved for distribution to employees in Pennsylvania. (ECF No. 29 at 17.)

at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole." *LCI Commc'ns, Inc. v. Wilson*, 700 F. Supp. 1390, 1395 (W.D. Pa. 1988); *see also DeWitt Cty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999) ("Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another.").

Although neither party has explicitly put forth this argument, and the detailed circumstances surrounding the start of Sharp's employment with Globus have not yet been fleshed out by discovery, the Court considers the strong possibility that the February 2020 MMGDA—which, in addition to establishing the terms of his compensation, also constituted Sharp's employment offer letter—and February 2020 NCNDA—which was required as a condition of Sharp's employment—arguably comprise one employment contract between Globus and Sharp, governed by the NCNDA's Pennsylvania choice of law provision. *See, e.g.*, *LCI Commc'ns*, 700 F. Supp. at 1395-96 (interpreting letter agreement and non-competition agreement, both of which were executed on the same day and "relate[d] to [employee's] contract of employment," as "one employment contract"); *Sullivan v. Microsoft Corp.*, 618 S.W.3d 926, 933-34 (Tex. Ct. App. 2021) (finding non-compete agreement and offer letter doubling as a compensation agreement to constitute "one unified contract" when they were executed on the same day such that the non-compete agreement's forum-selection clause governed all contractual disputes). At the very least, this weighs in favor of Pennsylvania law governing the February 2020 MMGDA, as well as the ensuing agreements that modified the February 2020 MMGDA's terms regarding Sharp's compensation.

Accordingly, Pennsylvania law governs the Compensation Agreements should the

repayment obligation provisions ultimately be found to be akin to loan repayment provisions.

2.     Liquidated Damages

Sharp argues that the repayment obligation provisions are not loan-type repayment provisions but instead impose a "penalty" on him for his departure. (*See* ECF No. 21-1 at 7-8.) As discussed above, the Court finds that, under at least one reasonable interpretation of the Compensation Agreements, the repayment obligation provisions provide for liquidated damages, and, potentially, an unenforceable penalty, should Sharp depart Globus. Liquidated damages provisions are treated the same under Pennsylvania and Texas law. Both states determine the enforceability of such provisions by considering whether the amount of liquidated damages called for is a reasonable forecast of just compensation for the harm that is caused by the breach of the contract, and whether the harm caused by the breach is difficult to estimate in advance. *See, e.g.*, *Meyer-Chatfield v. Century Bus. Servs., Inc.*, 732 F. Supp. 2d 514, 522 (E.D. Pa. 2010); *Pantuso Motors, Inc. v. Corestates Bank, N.A.*, 798 A.2d 1277, 1282 (Pa. 2002) (citing Restatement (Second) of Contracts § 356); *Atrium Med. Ctr. v. Houston Red C LLC*, 595 S.W.3d 188, 196 (Tex. 2020) (citing Restatement (Second) of Contracts § 356); 11 West's Pa. Prac., Trial Handbook § 33:20 (3d ed. 2021) (citing *Commonwealth v. Musser Forests, Inc.*, 146 A.2d 714 (Pa. 1958)); 4 Tex. Prac. Guide Bus. & Com. Litig. § 21:90 (2021); *cf. Haass*, 818 S.W.2d at 387-88. And as such, in both states, unreasonably large stipulated damages provisions constitute unenforceable "penalties," as Sharp labels the repayment obligation here.[13]

---

[13] Although Texas courts have held that both findings—a reasonable forecast of just compensation for the harm that is caused by the breach of contract and difficulty in estimating the harm caused by the breach—are "indispensable" for a liquidated damages provision to be enforceable, and Pennsylvania courts have not used such strong language regarding the latter finding, this would not impact the Court's analysis, and it would still reach the same conclusion applying each state's law. *Bunker v. Strandhagen*, Civ. A. No. 14-00510, 2017 WL 876374, at *6 (Tex. Ct. App. Mar. 3, 2017) (citing *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d

Accordingly, there would be no conflict, and the law of the forum state—Pennsylvania—governs the Compensation Agreements should the repayment obligation provisions ultimately be found to be akin to liquidated damages provisions.

## V.    CONCLUSION

For the reasons stated, Sharp's motion for judgment on the pleadings is denied. Both parties, however, are free to reraise their arguments presented in connection with the instant motion at a later stage, once the Compensation Agreements' ambiguities are resolved through the discovery process. An Order consistent with this Memorandum will be docketed separately.

---

59, 69 (Tex. 2014)).